## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JERRY W. SHUMATE,

        Plaintiff,

v.                                          No. CIV 02-75 BB/LFG

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

### MAGISTRATE JUDGE'S ANALYSIS
### AND RECOMMENDED DISPOSITION[1]

     Plaintiff Jerry W. Shumate ("Shumate") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").  The Commissioner determined that Shumate was not eligible for Social Security

Disability Insurance Benefits ("DIB") or Supplemental Security Income ("SSI").  Shumate moves this

Court for an order reversing the Commissioner's final decision and remanding for a rehearing.  [Doc.

8.]

     Shumate was born on April 7, 1962 and was 38 years old when the administrative hearing

took place.  He completed about nine years of undergraduate education and then attained a G.E.D.

---

[1]Within ten (10) days after a party is served with a copy of these findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such findings and recommendations.  A party must file any objections with the Clerk of the U.S. District Court within the ten-day period allowed if that party wants to have appellate review of the findings and recommendations.  If no objections are filed, no appellate review will be allowed.

In late 1999 and early 2000, he also took some college level courses in computers or electronics before withdrawing due to alleged stress or pain.  He suffered a work-related accident on July 31, 1993, resulting in a back injury.  He apparently continued to work for about a year until a chiropractor allegedly took him off the job.  [Tr. at 232.]  Shumate has not worked since August 1, 1994.  He was previously employed as a bartender, laborer and heavy equipment operator.  He is divorced and has custody of his two children and apparently subsists on Aid to Families with Dependent Children ("AFDC") and food stamps.  [Tr. at 232.]

In April 1999[2], Shumate applied for DIB and SSI benefits and alleges an onset date of April 5, 1997[3], based on pain in his lower back, hip and legs, muscle cramps, pain in his upper back, weakness, asthma, and depression.  [Doc. 9, at 1.]  Shumate's application for DIB and SSI benefits was denied at the initial and reconsideration stages, and he sought timely review from an Administrative Law Judge ("ALJ").  An administrative hearing was held on July 6, 2000.  In a decision, dated July 26, 2000, the ALJ found that Shumate was not eligible for DIB or SSI benefits because he retained the residual functional capacity ("RFC") for medium exertional work and could return to the work he performed previously as a bartender.  [Tr. at 18.]  Shumate challenged this determination to the Appeals Council which denied his request for review on December 5, 2001.  [Tr. at 6.]  This appeal followed.

---

[2]The ALJ's decision [Tr. at 14] states that Shumate applied for benefits in April 1997, but that appears to be a typographical error.

[3]Shumate's onset date apparently reflects the date of an earlier denial of SSI benefits.  [Tr. at 233.]

## <u>Standards for Determining Disability</u>

In determining disability, the Commissioner applies a five-step sequential evaluation process.[4] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[5]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[6] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[7] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[8] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[9]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[4]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988).

[5]20 C.F.R. § 404.1520(a)-(f) (1999); <u>Sorenson v. Bowen</u>, 888 F.2d 706, 710 (10th Cir. 1989).

[6]20 C.F.R. § 404.1520(b) (1999).

[7]20 C.F.R. § 404.1520(c) (1999).

[8]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[9]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[10] age, education and past work experience, he is capable of performing other work.[11] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[12]

### Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he

---

[10]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[11]20 C.F.R. § 404.1520(f) (1999).

[12]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).   If

supported by substantial evidence, the decision of the Commissioner is conclusive and must be

affirmed.   The Court cannot re-weigh the evidence or substitute its judgment for that of the

Commissioner.   Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After evaluating Shumate's medical records and considering his testimony, along with that

of the Vocational Expert's, at the hearing, (Tr. at 14-19), the ALJ rejected Shumate's claim for

benefits at step four, concluding that he retained the RFC to return to the work he performed

previously as a bartender.  (Tr. at 18.)  In reaching this decision, Judge Paul J. Keohane made the

following findings:  (1) Shumate had not engaged in substantial gainful activity since the alleged onset

of disability; (2) Shumate has an impairment or combination of impairments that are considered

"severe"; (3) the impairments do not meet or equal any of the Listings; (4) Shumate's allegations

regarding his limitations were not totally credible; (5) the ALJ considered all of the medical opinions

in the record; (5) Shumate has the functional capacity for medium exertional work; (6) vocational

expert testimony established that Shumate's past relevant work as a bartender did not require the

performance of work-related activities precluded by his RFC; (7) Shumate's medically determinable

lumbar joint and disc disease and depression do not prevent him from performing his past relevant

work; and (8) he was not under a disability, as defined by the Social Security Act, at any time through

the date of the ALJ's decision.  (Tr. at 18.)

In this appeal, Shumate asserts that the case must be reversed and remanded due to "at least

three errors" committed by the ALJ:  (1) the ALJ's credibility findings were contrary to the evidence

and law; (2) the ALJ failed to accord the proper weight to the opinions of Shumate's treating

physicians; and (3) the past relevant work finding was contrary to the evidence and the law.  [Doc. 9,  p. 3.]  The Commissioner argues that the ALJ's decision was supported by substantial evidence and that his determination of nondisability was consistent with regulatory criteria.  [Doc. 10.]

After a review of the entire record, this Court agrees with Shumate that this matter should be remanded for further proceedings consistent with this opinion.

## Summary of Shumate's Medical Care/Conditions

In July 1993, Shumate had an accident at work, resulting in an injury that precipitated his complaints of back pain.  He told a physician in February 1997 that he delayed seeking medical treatment for the injury for one year after the July 1993 accident.  [Tr. at 125.]  Notwithstanding Shumate's allegations that he sought medical assistance in about August 1994 and that a chiropractor "took him off the job" then [Tr. at 128, 232], there are no medical records for any medical treatment prior to January 1997.  [Tr. at 126.]

In 1997, there are four medical records documenting Shumate's visits to the University Hospital's Department of Orthopaedics.  [Tr. at 123-126.]  On January 16, 1997, he complained of pain in the lower back and in both hips and legs, with occasional sharp pain between his shoulder blades.  He rated the pain as a 9 out of 10.  He was taking Baclofen (muscle relaxant) and Naproxen (anti-inflammatory agent) and was prescribed Doxepin (anti-depressant).  On February 4, 1997, Shumate's MRI scan of his lower back, bone scan and plain x-rays of his spine and pelvis were all normal.  There was no radiographic evidence of a previous injury or explanation for Shumate's pain.  He was receiving trigger point injections at the pain clinic.  [Tr. at 125.]  Dr. Rivero noted that Shumate walked with a left-sided limp.  [Id.]  The record also indicates that Shumate was working with an attorney at the time as to workers' compensation benefits.  [Id.]  On February 13, 1997,

6

Shumate was seen at the University Hospital with essentially the same complaints. Again, the record notes that Shumate was attempting to obtain workers' compensation or disability benefits. On March 18, 1997, after an extensive work-up, Dr. Rivero was unable to identify a surgically treatable lesion. Shumate was to continue with the Pain Clinic. [Tr. at 123.] There are no additional medical records for the year 1997.

There are four medical records for 1998. On May 26, 1998, there is a radiology report indicating that Shumate had mild "levo scoliosis" of the lower lumbar spine which might be postural. Otherwise, the exam was normal and there was no significant degenerative spurring or facet disease seen. [Tr. at 122.] On September 2, 1998, Shumate was evaluated for a possible hernia. No hernia was found, but the record notes back pain. [Tr. at 121.] On September 14, 1998, Shumate complained of pain in his lower back and left inner thigh with occasional weakness in both legs. He also complained of poor sleep. He rated his pain as an 8-9 out of 10. He was taking Tylenol, Alleve and Ibuprofen. He was given prescriptions for Flexeril[13] and Doxepin [Tr. at 120.] The October 14, 1998 medical record documents complaints of pain in Shumate's lower back and both legs. He rated his pain as a 7 to 8. He was taking Tylenol, Alleve, Ibuprofen, Doxepin and Flexeril but stated that the Doxepin was of no help. [Tr. at 118.]

It appears that Dr. William Johnson reviewed the physician's notes as to Shumate's visits on February 13, 1997, September 14, 1998, and October 14, 1998, or examined Shumate himself. Dr. Johnson is the Medical Director of the Pain Management Center for Carrie Tingley Hospital at UNM. [Tr. at 116.]

---

[13]Flexeril is an adjunct to rest and physical therapy for relief of muscle spasm associated with acute painful musculoskeletal conditions. PDR, at 1929.

In 1999, the year Shumate applied for social security benefits, there are about six medical records documenting visits.  Most of the other 1999 records reflect consultative examinations.  On March 15, 1999, the University Hospital record notes his complaints of pain in his lower back and legs, with "charlie horses."  He rated his pain as an 8.  He was taking Ibuprofen but had stopped the Doxepin because it made him feel tired in the day.  He was prescribed Flexeril.  [Tr. at 119.]

On April 9, 1999, Shumate underwent a psychological evaluation by Clifford Morgan, Ph.D. [Tr. at 104-112.]  The evaluation was ordered by the Commissioner.  [Tr. at 16.]  Shumate was married at the time to an Acoma Indian and lived in his wife's home on the Acoma reservation.  They had two step-children from his wife and two natural children.  Shumate had a difficult and abusive childhood and an early history of using alcohol and drugs beginning in the tenth grade.  [Tr. at 106.] Shumate never had any formal treatment for substance abuse.  He was arrested in his teenage years for public intoxication.  [Tr. at 107.]  Shumate told Dr. Morgan that he and his wife had previous problems with alcohol abuse but that they were sober.  He reported a history of asthma and ulcers. Shumate also described his work-related accident in July 1993 and stated that his company or its insurer continued to pay him until sometime in 1996.  He denied any previous contacts with mental health care professionals.

During the examination, Shumate needed frequent breaks due to pain and it was noted that he walked with a noticeable limp.  [Tr. at 108.]  His mood was depressed but he also displayed a "positive sense of humor."  [Id.]

Dr. Morgan conducted a number of tests on Shumate.  The mental status exam and neuropsychological screen indicated he had some mild cognitive impairment, possibly secondary to

depression.  [Id.]  His verbal processing was not as good as his eye hand coordination and spacial relationship ability.  Dr. Morgan concluded he had a learning disability.  [Tr. at 109.]

Shumate scored within the Severe Classification for Depressive Symptoms and met the criteria for Major Depressive Disorder.  [Tr. at 110.]  His self concept and esteem were low.  He tired easily and did not sleep well.  He had very high scores on depression, anxiety, hostility, symptom dependency and chronic maladjustment.  Dr. Morgan found that he was experiencing moderate to severe depression and anxiety.  [Tr. at 110.]

Dr. Morgan noted that Shumate's physical limitations might not allow him to participate in any of the occupations in which he revealed interest, i.e., working with his hands.  Dr. Morgan concluded that Shumate was faced with a career change, had academic problems that needed to be addressed, might benefit from therapy and should enroll immediately in basic education courses.  [Tr. at 111.]  Dr. Morgan assigned a GAF of 60.  [Tr. at 112.]

On April 26, 1999, Shumate complained of lower back pain and pain in his legs to Dr. Johnson.  Shumate rated the pain as a 9-10.  He was taking Ibuprofen but was out of Cyclobenzaprine (muscle relaxant) and Klabapentin.  [Tr. at 117.]  The medical record is very brief, although it also contains a notation to "see dictation."   On the same day, Dr. Johnson wrote a letter "to whom it may concern," stating that Shumate had been seen for chronic myofascial[14] and neuropathic pain and was

---

[14]According to Shumate's counsel's letter, myofascial pain syndrome is another term for fibromyalgia. "Myofascial pain syndrome is a condition that is typified by a history of widespread pain."  [Tr. at 219.] Myofascitis is defined by Stedman's Medical Dictionary as the hardness of muscles due to the grown of fibrous tissue.  Based on the medical record discussed in Vogrin v. Barnhart, 2002 WL 31156842 at *2 (D. Kan. Aug. 20, 2002), it appears that fibromyalgia and myofascial pain are distinct.  The doctor in that case discontinued trigger point injections concluding that because myofascial pain normally responded to trigger point injections, fibromyalgia might be causing the plaintiff's pain in that case.  Fibromyalgia has been discussed as "'a common, but elusive and mysterious' disease, whose 'causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective.  The principal symptoms are 'pain all over,' fatigue, disturbed sleep, stiffness, and . . . [notably] multiple tender spots [sometimes called trigger points . . . that when pressed firmly cause the patient to flinch."  Sarchet v. Chater, 78 F.3d 305, 306-07 (7th Cir. 1996).

unable to work in Dr. Johnson's medical opinion.  [Tr. at 116.]  On April 26, Dr. Johnson also filled out a Functional Limitations and Work Tolerance Checklist, showing that Shumate could not work six or eight hours a day and essentially could not lift more than 10 pounds.  [Tr. at 113.]  Most of the boxes on the form were checked, indicating that Shumate could not work in the cold, sudden temperature changes, wetness, dusty or noisy environments, cramped quarters, high places, and around vibrations or mechanical hazards.  He could not walk, stand or sit for prolonged periods.  He could not jump, run, bounce, climb, crawl, turn, stoop, crouch, kneel or balance.  [Tr. at 113.]

On this same day, April 26, Shumate applied for disability insurance benefits.  [Tr. at 53.]  On the disability report, Shumate stated that he was suffering from lower back pain, and pain in his hip and legs.  His legs were weak and unstable.  Shumate stated that he could hardly do anything because of the pain and weakness.  The disability interviewer noted that Shumate "kind of dragged his right leg and limp[ed] in contrast to Dr. Rivero's note in 1997 of a left-sided limp.  [Tr. at 70, 125.]  When Shumate walked out of the office into parking lot he still continued to walk with difficulty."  [Tr. at 70.]  On the April 28, 1999 daily activities questionnaire, Shumate stated that all of his activities had been limited because of his problems, that he had to rest one to two hours after anything he did, and that he could not climb a flight of stairs.  However, he could walk daily for ½ mile, did not use an assistive device to walk and was able to drive.  [Tr. at 72.]  He characterized himself as very grouchy and irritable and not able to follow instructions well.  He was on a number of medications, including Albuterol (asthma), Prilosec (stomach), Celebrex (arthritis), Neurontin (for one-time seizure), Nortryptiline (depression), Ibuprofen (800 mg/daily) and Cyclobenzaprine (muscle relaxant), Ultram (pain reliever), and Valium (depression).  [Tr. at 74, 100.]

Shumate was having marital difficulties and filed for divorce on June 4, 1999.  [Tr. at 177.] He sought and was granted full time legal custody of two of the children.  [Id., and Tr. at 230.]

On August 9, 1999, Shumate was evaluated by Dr. G.T. Davis, a consulting physician for social security.  [Tr. at 127-130.]  Dr. Davis performed a clinical assessment, examined Shumate and reviewed some medical documentation.  Shumate told Dr. Davis that he was a patient at the Pain Center and that he saw Dr. Johnson every two to three months.  [Tr. at 128.]  UNM had provided him a TENS unit to wear on his low back where he had the most pain.  Shumate stated he had seen a chiropractor in August 1994 who told him not to return to work.  [Tr. at 128.]  He told Dr. Davis that he could walk about two blocks at a time and that he needed to make several stops during his drive from Grants that day.

The reports further states that Shumate's wife had thrown him out of the house about three months ago because he was grouchy and in pain all the time.  He was living in an apartment and was able to get by with help from his 11 year old son.  He sated that the TENS unit helped a little but that nothing really relieved his pain.  [Tr. at 128.]

Upon examination, Dr. Davis noted that Shumate walked with a "rather bizarre antalgic gait. As he would step forward with the left foot, he would tilt his body significantly towards the left, and then suddenly straighten himself up, as he stepped forward."  "He did not use any assistive devices." [Tr. at 129.]  Shumate withdrew with very light touch over the low and mid back "which is usually a nonorganic sign."  Other nonorganic findings were made during the examination of Shumate.  His motor, sensory and reflex functions were intact and his motor and sensory functions were normal. [Tr. at 129.]  He showed good motion of the hips, knees and ankles.

11

Dr. Davis concluded that Shumate had some "significant nonorganic Waddell type findings on exam." He could not determine what exactly was going on with Shumate. Based on the information before him, Dr. Davis found no significant evidence to indicate that Shumate could not be working or doing more activities "if he wished to. He seems to be demonstrating a lot of pain-oriented behaviors." [Tr. at 130.]

On August 24, 1999, Dr. Stewart conducted a Physical Residual Functional Capacity Assessment. [Tr. at 135.] Dr. Stewart concluded that Shumate could engage in occasional lifting of 50 pounds and frequent lifting of 25 pounds. He could stand or walk for a total of about 6-8 hours per day. He noted the positive Waddell's signs and the bizarre antalgic gait found by Dr. Davis. Dr. Stewart found no other limitations. [Tr. at 135-42.] On September 10, 1999, Dr. Halley reviewed the findings of Dr. Stewart and agreed with his assessment. There were no good objective signs of neuromuscular deficit and a history of negative MRI's and other tests. "It would appear there is magnification of history as well as physical findings. Psychiatric review requested." [Tr. at 143-44.]

On September 15, 1999, Shumate's application for disability benefits was denied. [Tr. at 37.] He asked for reconsideration on November 10, 1999. [Tr. at 41.] The request for reconsideration was denied in January 2000. [Tr. at 43.] The SSA noted that the medical evidence showed he had some back pain and depression that were helped with medication. While he had been experiencing some depression due to ongoing pain, there was no evidence of a severe psychotic impairment. He should be able to engage in work not requiring lifting more than 50 pounds. [Tr. at 43.]

In October 1999, Shumate was being seen health care providers at the Grants Medical Center. He complained of congestion and stomach pain on Oct. 4. He was taking Ibuprofen, Neurontin, and

Flexeril.  [Tr. at 159.]  The October 12, 1999 record is difficult to read but notes chronic back pain

and medications he was taking.  [Tr. at 158.]

In November 1999, a psychiatric review was performed.  The reviewer concluded that

Shumate had chronic pain and depression but was "cognitively intact – no marked restrictions . . . ."

He was given a rating of  "slight" as to degree of limitation regarding activities of daily living and no

limitations regarding social functioning, concentration, decompensation in work-like settings, etc.

[Tr. at 154.]

In November and December 1999, Shumate was seen by Dr. Kathy Cubine at the Grants

facility.  He reported ear and lung problems.  He wanted to stop smoking and his depression was

discussed.  His lab results were normal.  [Tr. at 157.]  On December 17, he was doing better.  In

December, he was taking Biaxin (antibiotic), Ultram (for pain) and Ibuprofen and using a Flovent

inhaler.  [Tr. at 156.]  It appears from these records that Shumate was trying some different anti-

depressant medications, including Elavil and Wellbutrin.

In January 2000, Shumate had a chest x-ray that was negative.  He was having respiratory

difficulties.  [Tr. at 197.]  On February 8, 2000, Shumate was notified that tests showed blood in the

stool.  On February 15, he stated he could not stop worrying about this problem and also complained

of ringing in his ears.  [Tr. at 200.]

In February 2000, Shumate began seeing Beth Armstead, a psychologist, at the Valencia

Counseling Services for depression.  [Tr. at 170, 186.]  Dr. Baca, a psychiatrist managed his

medications.  Initially, he presented with medical problems and depressive symptoms.  As of February

2000, Shumate's divorce proceedings were ongoing, and two of his children were in his custody.  He

was enrolled at New Mexico State University but stated that he might need to withdraw due to

13

medical problems.  The counselor noted that he was "distraught over blood in his stools and is undergoing tests" regarding that problem.  [Id.]

The Initial Assessment form, completed by Armstead, notes that Shumate recognized that he was withdrawn, isolated, scared of people, and that he had decreased interest in activities but that he thought it was related to his problems with his wife.  [Tr. at 177.]  The form indicates complaints of ringing in the ears, frequent waking from chronic pain, and stomach problems.  He was drinking 4-5 pots of coffee per day and smoking 2 packs of cigarettes daily.  [Tr. at 182.]  Shumate admitted to Armstead that he did not like to take his medications.  He also stated that he never liked doctors and avoided them even when he was hurt.  He learned to tolerate the pain.  [Tr. at 181.]  The diagnoses indicated by Armstead were major depression, "severe, without psychotic features" and back and lower body pain, asthma, mild arthritis, blood in stool.  She gave him a GAF of 45.

On February 25, 2000, Shumate told Armstead that he was having a test to determine the problem with his colon.  He was also worried about the possibility of withdrawing from college due to medical problems and then being under pressure by Human Services to work to keep benefits.  He stated that he enjoyed the last semester of college and earned a 3.6 GPA which helped his self esteem.  He exhibited a depressed mood and "victim persona".  [Tr. at 176.]

On March 8, 2000, Shumate told Armstead that he was withdrawing from college because of medical problems, stress and difficulty concentrating and comprehending the written text.  He was worried about being able to work at that time.  [Tr. at 175.]

On March 16, 2000, Dr. Baca saw Shumate and noted that he recently was taking Amitriptyline (Elavil) which helped some but had excessive side effects.  Dr. Baca's diagnostic impressions were depression, asthma, chronic back/leg pain, ulcer, rectal bleeding.  He assigned a

GAF of 48. [Tr. at 171.] Shumate reported depression with varying intensity for the last several years but that it was worse over the last year. He was currently on a lot of medications, including Amitriptyline, Ibuprofen, Flexeril, Neurontin, Prilosec, Ranitidine (ulcer treatment), and using inhalers as needed. [Tr. at 173.] Shumate was concerned with the possibility of colon cancer and worried over the divorce proceedings, caring for his children alone and financial issues. He told Dr. Baca that he had to drop out of school due to depression and physical problems. [Tr. at 173.]

On March 21, 2000, Shumate told Armstead that he sometimes fell asleep at night without taking his medications. [Tr. at 170.] On April 5, Shumate reported he had been compliant with his medications and was sleeping better. [Tr. at 169.] On April 13, Shumate saw Dr. Baca who reported that his change to Pamelor was helping Shumate's sleep some and possibly his mood. [Tr. at 168.] On April 19, he told Armstead that his stepson was living with him. His affect was brighter as he felt better helping others, but he still exhibited negative self esteem. [Tr. at 167.] On May 3, 2000, it appeared that Shumate's divorce was proceeding and that custody issues would be finalized soon. He reported that his main stressor "now [was] his physical health." He also stated that he hurt his back when trying to help out with yard work during the past week. [Tr. at 166.]

In March and April 2000, Shumate returned to the Grants Medical Center and complained about his ears still ringing. He had the Ibuprofen prescription re-filled. [Tr. at 199, 203.] He was having heartburn and abdominal problems. He needed re-fills on his Prilosec and Ranitidine. [Tr. at 204.] On May 2, 2000, he complained of back and leg pain, chest pain and an earache. He was given samples of Celebrex and Ultram. [Tr. at 204.] The May 10th medical record indicates that Shumate is still in chronic pain and that nothing was any better. Dr. Cubine referred him to Dr. Rolwing, a chiropractor. [Tr. at 205.]

On May 11, 2000, Shumate told Dr. Baca that he was doing all right with the Pamelor but that his depression continued.  Dr. Baca recommended Celexa at a low dose.  [Tr. at 165.]  Also on May 11, Dr. Baca wrote a letter to New  Mexico Human Services that Shumate was being treated for medication management and problems associated with chronic depression and associated chronic pain.  "He remains unable to work due to the severity of his mental and physical symptoms.  I expect his current level of disability to last at least 12 months."  [Tr. at 193.]

On May 17, 2000, Shumate brought his daughter with him to therapy.  His divorce was final and he had custody of the two children.  His affect was brighter.  Shumate told Armstead that his chiropractor thought his back problems were due to some "deep seated emotional" problem.  [Tr. at 164.]

On May 18, 2000, Shumate told Dr. Cubine that he thought Dr. Rolwing was going to help. He was stretching and doing exercises.  [Tr. at 205.]

On June 1, 2000, Dr. Cubine addressed a letter "to whom it may concern," stating that Shumate was her patient and that he suffered from chronic hip and back pain, various neuropathies of which etiology is unknown, chronic tinnitus, history of seizure, gastritis and major depression.  [Tr. at 194.]

On June 15, 2000, Shumate told Dr. Cubine that he had abdominal pain, nausea and that he ran out of his medications.  He no longer was seeing Dr. Rolwing and was smoking two packs of cigarettes daily.  He appeared to get re-fills on Flexeril and Ultram.  He was taking Wellbutrin.  [Tr. at 205.]  A June 23 record states that Shumate was "some better."  [Tr. at 198.]

On June 28, 2000, Dr. Rolwing wrote a report describing Shumate's chiropractic care.  [Tr. at 190.]  The report notes that Shumate's chief complaints were pain in the low back, hips and legs.

His right leg was worse than the left.  He had severe muscle cramps in his calves.  His right hip popped in and out.  He had had one seizure for which he was on Neurontin.  He was being treated for depression.  He walked with a "very noticeable limp, swinging his right leg out to the side." Shumate exhibited an aversion to being touched coupled with his experience of constant pain.  Dr. Rolwing noted that if he placed just a finger on Shumate's back "or any other part of his body, his entire body goes into a spasm."  [Tr. at 191.]  Dr. Rolwing treated Shumate five times over three weeks.  He recommended that Shumate come twice a week but stated Shumate was not always compliant with his appointments.  Dr. Rolwing gave Shumate exercises designed to release chronic muscle contraction.  After his visit on May 30, Shumate canceled his next appointment due to complaints about a possible hernia.  Dr. Rolwing believed that Shumate's condition was "exclusively muscular in origin" and therefore, would not manifest on imaging studies.  [Tr. at 191.]  He suspected that chronic muscle contraction was causing Shumate's pain and that he needed to regain conscious control over his muscles.  [Tr. at 191.]  His final diagnosis was Myofascitis due to chronic muscle contraction.

At the July 6, 2000 administrative hearing, Shumate testified. that he was able to care for his 12 year old son and his eight year old daughter who lived with him.  [Tr. at 230.]  He was able to raise them himself, feed them, bathe them, send them to school and help them with their schoolwork. He also was able to take care of his own personal needs, including dressing, combing his hair, taking a bath or shower.  [Tr. at 242.]  His children helped him with grocery hopping and household chores like vacuuming and washing.  [Tr. at 242.]  He stated that he had no hobbies or that he had to give up everything.  He used to work in the yard or help out neighbors but no longer could do that.  [Tr.

at 244.]  He goes to church but not to movies or sporting events.  He does not visit with family or friends and has no friends.  [Tr. at 245.]  He watches the news on TV but does not read.

Shumate described his main complaints as pain in the lower back and in his legs.  [Tr. at 236-37.]  He said he was in constant pain and that the pain medications worked only to a point.  [Tr. at 237.]  Shumate testified that he could only walk 30 minutes at a time before needing to rest or sit down.  [Tr. at 240.]  He could neither sit nor stand more than 15 minutes at a time.  [Tr. at 240.]  He was comfortable lifting from five to ten pounds.  [Tr. at 241.]  His hands were shaky when he tried to grip things.  [Tr. at 242.]  He was able to sleep only 3 to 5 hours per night and sleep medications were of no help to him.  [Tr. at 241-42.]  He woke up three to four times a month with migraine headaches.  [Tr. at 246.]  Upon questioning by his attorney, Shumate further stated that he had problems with his stomach and asthma and took medications for those conditions.  He explained that he had quit school in 2000 because he had pneumonia and was worried about blood in his stool.  However, he also stated that "they suggested that [he] withdraw until [he] got his neck problems taken care of."  [Tr. at 252.]

Shumate told the ALJ that he also suffered from depression that started right after his accident.  [Tr. at 238.]  He described himself as being very depressed because he could not do what he was used to doing, and that to ask for help "brings him down."  [Tr. at 239.]  He also stated that he "backed away from people" because of his depression and that his memory was terrible, that he tended to forget everything.  [Tr. at 240.]

When asked about the Waddell findings or the suspicion that Shumate might be faking some of his symptoms, Shumate's response was incomprehensible.  "I found true that with several people . . . ."  [Tr. at 248.]  He also said he was disappointed and depressed.

He testified that he was a loner and does not like to be around people. The ALJ wondered how he could have worked as a bartender without talking to people. Shumate stated that his previous employer had liked that about him. He did not stand around and talk; he kept busy. [Tr. at 249.]

Shumate admitted that he had a TENS unit at the house but had not used it since February or March because it needed new leads. [Tr. at 247.] As to why he had not fixed it, he said he had not thought of it. "Anyway I can't, I'm on so much medication I don't know whether I'm coming or going, I can't remember things." [Tr. at 247-48.] He stated that he was supposed to use a cane but did not use any assistive devices because "[i]t's embarrassment." However, he has a back brake and a hip brace that he uses on occasion "when the pain is intense". [Tr. at 249.] He then explained that he used the hip brace if he was going to do any "prolonged walking." [Tr. at 250.] The ALJ wondered when he would wear the brace at all since he testified that did not do any prolonged walking. Shumate then stated that with the hip brace, he could walk for a half mile. With further questioning by both the ALJ and his attorney, it appeared that Shumate stated he used his hip brace at least once or twice a month to do prolonged walking which Shumate defined as "going cross-country", "going across hills or something like that." [Tr. at 267.]

## Discussion

## I.   EVALUATION OF CREDIBILITY

In reviewing the ALJ's determinations of Shumate's credibility, the Court should "defer to the ALJ as trier of fact, the individual optimally positioned to observe and assess witness credibility." Casias v. Sec'y of HHS, 933 F.2d 799, 801 (10th Cir. 1991). Great deference should be given to the ALJ's conclusion as to credibility. Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995). A claimant's

testimony alone is insufficient to establish the existence of disabling pain.  Talley v. Sullivan, 908 F.2d

585, 587 (10th Cir. 1990).

The Tenth Circuit set forth the following framework to analyze subjective complaints of

disabling conditions:

> (1) whether the claimant established a pain-producing impairment by
> objective medical evidence; (2) if so, whether there is a 'loose nexus'
> between the proven impairment and the claimant's subjective
> allegations of pain; and (3) if so, whether, considering all the evidence,
> both objective and subjective, claimant's pain is in fact disabling.

Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir. 1987).  If the plaintiff satisfies the first two factors,

the ALJ must consider the assertions the plaintiff's assertions regarding subjective conditions and

decide whether they are credible.   In making such determinations, the following factors are

considered:   levels of medication and their effectiveness, the extent to which Plaintiff attempts to

obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of

credibility that are peculiarly within the judgment of the ALJ, the motivation and relationship between

the claimant and other witnesses and the consistency or compatibility of non-medical testimony with

objective medical evidence.  Huston v. Bowen, 838 F.2d 1125, 1132 (10th Cir. 1988);  Luna, 834

F.2d at 165-66.

The ALJ need not engage in a formalistic factor-by-factor recitation of the evidence.  Qualls

v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000).  Findings of credibility, however, should be closely

linked to substantial evidence and not just a conclusion in the guise of findings.  Kepler, 68 F.3d at

391.

Here, Judge Keohane stated that Shumate's testimony at the administrative hearing was not

helpful, "and that he was not considered to be a credible witness."  [Tr. at 16.]  However, the ALJ

did not provide any specific observations about Shumate's behavior or conduct at the hearing, for example, whether Shumate appeared uncomfortable or had difficulty moving or sitting for any length of time.  Judge Keohane found that Shumate's testimony that he was unable to remain seated for more than 30 minutes, to stand for more than 15 minutes or to lift more than 10 pounds to be inconsistent with the "lack of objective signs or findings of a physical basis for his complaints." Specifically, Judge Keohane discussed that while Shumate received tentative diagnoses of a myofascial pain syndrome, there were no reports of trigger point findings to substantiate such a diagnosis.  [Tr. at 16.]

Notwithstanding the great deference owed to the ALJ, the Court respectfully disagrees with the ALJ's credibility findings.  While Shumate's medical records might not be voluminous, they document multiple visits to health care providers when he consistently complained of pain in his back, hips and legs.  [*See* discussion of medical history *supra*.]  Moreover, Judge Keohane's finding that Shumate's testimony about his limitations was unsupported by objective medical testimony is contradicted by a form filled out by Shumate's treating physician, Dr. William Johnson.  The form indicated that Shumate should avoid lifting more than 10 pounds, and could not stand, sit or walk for prolonged times.  [Tr. at 113.]

Most of the medical records further document that Shumate took a number of different types of medications for pain, inflammation, arthritis, muscular relaxation and sleep problems.  Some of the drugs were prescribed at significant doses.  Shumate continued to try different medications after reporting that certain drugs did not work or had adverse side effects.  The records also show that he was re-filling and apparently using the medications.  [Tr. at 156, 157, 165, 168, 173, 174, 198, 201, 203, 204.]  He tried a number of different kinds of pain treatments as well, including trigger point

injections, hydro therapy, chiropractic care, and a TENS unit.  [Tr. at 15, 103, 125, 128.]  The medical records also indicate that on more than one occasion, Shumate reported that nothing was helping him.  [Tr. at 119, 126, 128, 158, 205.]

In addition, medical personnel and the disability agency interviewer observed Shumate walking with a limp and with difficulty.  The disability interviewer noted both that Shumate was limping in front of her and that he was walking with difficulty in the parking lot when he did not know she was observing him.  [Tr. at 70.]  It is true, as Respondent points out, that observations varied about Shumate's "bizarre antalgic gait."  For example, Shumate was seen limping on the right and left sides at different points.  [Tr. at 125, 129, 191.]  However, it is difficult to know whether the observers made these comments while looking at Shumate from the front or back.  Moreover, based on the descriptions of his strange walk, it may have been possible to accurately describe the limp as being on either side.

The Court acknowledges that the consultative physician, Dr. Davis, found that Shumate's extreme sensitivity to touch was a nonorganic sign, and may well be consistent with a claimant's exaggeration of pain.  However, Shumate's chiropractor observed almost identical behavior by Shumate some 8 or 9 months after Dr. Davis saw Shumate.  [Tr. at 191.]  The chiropractor explained that the cause of Shumate's pain might be muscular tension which would not manifest on imaging studies.  Shumate's extreme muscular tension and tenderness were noted by more than one physician who examined him.  [Tr. at 120, 126.]

In addition, Shumate was consistent in describing the nature of his daily activities as being very limited.  At a September 1998 doctor's visit, his activities were noted as "limited" and his sleep was poor.  [Tr. at 120.]  On April 26, 1999, he stated that he had gotten to the point where he needed

help with doing little things like washing dishes and cooking.  He needed help to do grocery shopping or yardwork.  [Tr. at 66.]  On May 13, 1999, he wrote that all of his physical activities were limited because of weakness and instability.  [Tr. at 88.]  He needed help in taking shirts off and in trimming his toenails.  He could cut flowers or weeds for about 30 minutes before needing a break.  [Id.]

Finally, very few medical records demonstrate non-compliance by Shumate.  For example, he missed his initial intake appointment with the psychologist, but clearly re-scheduled it.  He did not continue to see the chiropractor or make as many visits as the chiropractor recommended.  However, the records show that he had other health concerns regarding a possible hernia that led to his cancellation of his last chiropractic appointment.  He did not like to take medications but re-filled many prescriptions and reported the side effects of the drugs to physicians.

In Orender v. Barnhart, 2002 WL 1747501 (D. Kan. July 16, 2002), the Court considered a similar claim of disability based on fibromyalgia.[15]  The Court noted that doctors diagnosed the plaintiff with fibromyalgia but that the record contained no evidence of medical tests.  Id. at *6.  Similar to Judge Keohane, the ALJ in Orender rejected the physician's opinion reasoning that it was not supported by medical tests or reference to positive trigger points.  Id.  In reversing the ALJ's decision, the Court stated in pertinent part that:

> [a] medical opinion based on a physician's evaluation of the patient's medical history, observations of the patient, and an evaluation of the credibility of the patient's subjective complaints of pain, is medical evidence supporting a claim of disabling pain, even if objective test results do not fully substantiate the claim.  See Nieto v. Heckler, 750 F.2d 59, 61-62 (10th Cir. 1984); Gatson v. Bowen, 838 F.2d 442, 447-448 (10th Cir. 1998) (medical doctor's clinical assessment is

---

[15]While it does not appear that any of the medical records actually state that Shumate was diagnosed with fibromyalgia rather than myofascial pain, etc., the Respondent appears to agree that fibromyalgia is the more accepted medical term for myofascial pain syndrome.  [Doc. 10, at 4.]

> objective medical evidence of disabling pain). . . . Therefore, [the
> treating physician's] opinion should not be discredited solely for lack
> of medical tests.

Id.

Here, like Orender, there were clinical assessments by Shumate's treating physicians showing that Shumate was experiencing severe pain. None of the records, other than those of the consultative physicians, indicate that the physicians did not believe Shumate's complaints of pain. Indeed, the fact that the physicians continued to prescribe pain medications and propose various pain-relieving treatments suggests that they did find Shumate credible. While the objective test results might not have revealed the source of Shumate's pain, it does not seem unbelievable that Shumate's pain could have resulted from muscular tension, consistent with the chiropractor's opinion.

In concluding that Shumate was not credible, Judge Keohane appeared to rely entirely on the fact that there were no medical tests showing the source of Shumate's pain. As stated by the Court in Orender, the lack of medical tests is an insufficient basis to discount a physician's assessments of the patient. Moreover, the ALJ did not discuss any of his observations of Shumate at the hearing, including whether Shumate limped, walked with difficulty, got up from time to time, or appeared to be experiencing pain. Based on the above discussion, the Court concludes that the ALJ's credibility determinations were not supported by substantial evidence and were not properly linked to record evidence. On remand, the ALJ is directed to follow the framework set out by the Tenth Circuit and to link his credibility determinations closely to substantial evidence in the record.

## II.   OPINIONS OF THE TREATING PHYSICIAN

The ALJ must "give controlling weight to a treating physician's well-supported opinion, so long as it is not inconsistent with other substantial evidence in the record." Drapeau v. Massanari,

255 F.3d 1211, 1213 (10th Cir. 2001).  The treating physician's opinion should be viewed in relation

to such factors as:  consistency with other evidence; length and nature of the treatment relationship;

frequency of examination; and the extent to which the opinion is supported by objective medical

evidence.   20 C.F.R. § 404.1527(d)(1)-(6).   A brief, conclusory or unsupported opinion may be

rejected.  Bernal v. Bowen, 851 F.2d 297, 301 (10th Cir. 1988).  In addition, a treating physician's

opinion that a claimant is totally disabled is not dispositive.  "[F]inal responsibility for determining

the ultimate issue of disability is reserved to the [Commissioner]."  Castellano v. Secretary of HHS,

26 F.3d 1027, 1029 (10th Cir. 1994).

Here, Judge Keohane briefly discussed the treating physician's opinion but discounted it.  [Tr.

at 16.]  The ALJ noted the "tentative diagnoses of a myofascial pain syndrome" and that there were

no reports of trigger point findings to substantiate such a diagnosis.  Judge Keohane then emphasized

that Dr. Johnson provided no clinical signs or findings for the diagnosis of a "neuropathic pain"

problem and did not explain the nature of the "neuropathic" pain diagnosis.  Judge Keohane also

found that no other health care provider acknowledged or mentioned the neuropathic pain diagnosis.

[Tr. at 16.]

The Court finds that the ALJ improperly discredited Dr. Johnson's opinion for a number of

reasons.  First, there is nothing in the record to support a finding that Dr. Johnson's opinion was

"tentative."   Dr. Johnson, the Medical Director of the Pain Clinic, treated Shumate on a number of

occasions.   Dr. Johnson's letter states that Shumate was being seen for "chronic myofascial and

neuropathic pain" and that "he is unable to work at this time."  [Tr. at 116.]  In addition, Dr. Johnson

was not the only provider to discuss Shumate's neuropathic pain.  Dr. Cubine, another treating

physician, also concluded that Shumate had "various neuropathies of which etiology [was] unknown."

[Tr. at 194.]   The chiropractor who saw Shumate approximately five times set forth a  "final diagnosis" of "Myofascitis due to chronic muscle contraction."  [Tr. at 191.]

Second, the fact that there may be little objective testing or evidence to support a diagnosis of fibromyalgia, etc. is not conclusive.  Fibromyalgia's symptoms "are entirely subjective . . . [and] there are no laboratory tests for the presence or severity of fibromyalgia."  Sarchet, 78 F.3d at 306. "Because of the unavailability of clinical tests for fibromyalgia, an ALJ cannot reject a physician's diagnosis of fibromyalgia on the grounds that it is not supported by objective medical findings."  Soto v. Barnhart, __ F. Supp. 2d __, 2003 WL 245103 at *2 (W.D.N.Y. Jan. 13, 2002).

In addition, while trigger point evaluations may be the only diagnostic technique to test for fibromyalgia, it does not appear certain that a diagnosis of fibromyalgia or myofascial pain syndrome is precluded without such testing.  See Liscano v. Barnhart, 230 F. Supp. 2d 871, 888 (N.D. Indiana 2002) (trigger point testing is "perhaps" the only diagnostic technique); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998) (trigger point injections "may provide" substantial evidence to support a finding of disability due to fibromyalgia).  "While it is true that no treating physician specifically noted that the plaintiff had the requisite '11 out of 18 trigger points,' the record is replete with treatment notes indicating that plaintiff's entire body was tender and painful to the touch."  Soto, 2003 WL 245103 at *2.  Here, the record does not identify specific or positive trigger points, but Shumate did receive trigger point injections and the record indicates that parts of his body were extremely sensitive to touch.

Third, it does not appear that the ALJ gave any credit to Dr. Johnson's opinion that Shumate could sit, stand or walk only for limited periods of time.  It may be that the form filled out by Dr. Johnson was supported by Shumate's own statements as to what he physically could or could not do.

26

However, even if true, a treating physician's opinion or testimony cannot be rejected merely because it is based on the claimant's statements.  Gage v. Commissioner, 221 F.3d 1347 (Table, Text in Westlaw), 2000 WL 564011 at *3 (9th Cir. May 9, 2000).  In fact, "[w]hen fibromyalgia is alleged, the credibility of a claimant's testimony regarding [his] symptoms must take on substantially increased significance in the ALJ's evaluation of the evidence."  Soto, 2003 WL 245103 at *4.

Fourth, another treating physician and a treating chiropractor, as described above and in the recitation of Shumate's medical history, reached conclusions consistent with those of Dr. Johnson. In addition, Dr. Baca, the psychiatrist who saw Shumate in 2000, concluded that he remained unable to work due to the severity of his mental and physical symptoms and that Dr. Baca expected his current level of disability to last at least 12 month.  [Tr. at 193.]  Indeed, only the consultative physician, Dr. Davis, differed with the opinions expressed by Dr. Johnson.  "[T]he opinions of physicians who have seen a claimant over a period of time for purposes of treatment are given more weight over the views of consulting physicians or those who only review the medical records and never examine the claimant."  Williams v. Bowen, 844 F.2d 748, 757 (10th Cir.1988) (citing Talbot v. Heckler, 814 F.2d 1456, 1463 (10th Cir.1987)).

The Court concludes that the consultative physician's report was not substantial evidence, nor should it have been relied on to reject the treating physicians' opinions in this case.  Even if the treating physician's opinion is not entitled to "controlling weight," the opinion still is assigned some amount of deference.  20 C.F.R. §§ 404.1527, 416.927.  Thus, the Court recommends remanding this matter so that the ALJ can adequately discuss what amount of weight to afford the different medical opinions and/or what specific and legitimate reasons exist, if any, to reject the treating physicians' opinions.

**Conclusion**

Because the Court finds that the ALJ improperly evaluated Shumate's credibility with respect to his condition and complaints of pain, and further failed to give proper weight to the opinions of his treating physicians, the Court recommends reversing the ALJ's decision and remanding for further proceedings consistent with this opinion. The case should proceed through the sequential evaluation as appropriate. Should the ALJ again find that Shumate's claim is to be rejected at step four of the sequential evaluation, he should provide specific findings at each of the three phases of step four in accordance with the Tenth Circuit's decisions in <u>Winfrey v. Chater</u>, 92 F.3d 1017, 1023-25 (10th Cir. 1996) and <u>Henrie v. United States Dep't of HHS</u>, 13 F.3d 359, 360-61 (10th Cir. 1993).

**Recommended Disposition**

That Shumate's Motion to Reverse and Remand for Rehearing [Doc. 8] be granted for the reasons stated herein and that this matter be remanded for further proceedings consistent with this opinion.

Lorenzo F. Garcia
United States Magistrate Judge

28